UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHAEL STEPPE,

     Plaintiff,

v.                                                            Case No:  6:12-cv-245-Orl-31TBS

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____

## REPORT AND RECOMMENDATION[1]

     This case came on for consideration without oral argument on the complaint filed

by Michael Steppe seeking review of the final decision of the Commissioner of Social

Security denying his claim for Social Security benefits.  (Doc. 1).  The Commissioner

answered the complaint and filed a certified copy of the record before the Social Security

Administration.  (Doc. 10).  This case has been referred to me for issuance of a report

and recommendation.  For the reasons that follow, I respectfully recommend that the

Commissioner's final decision in this case be affirmed.

    **I.**    **Procedural History.**

     On October 27, 2008, Steppe filed for disability and disability insurance benefits

("DIB").  (Tr. 21).  He alleged that his disability began on December 3, 2007.  (Id.)

Steppe's application was denied initially and upon reconsideration.  (Id.)  He requested

and received a hearing before an administrative law judge ("ALJ") on April 20, 2011.  (Id.)

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and
M.D. FLA. R. 6.02, within fourteen (14) days after service of this report and
recommendation.  Failure to file timely objections shall bar the party from a de novo
determination by a district judge and from attacking factual findings on appeal.

At the time of the hearing, Steppe, who has a college degree, was 59 years old with past relevant work history as a sales representative and area manager for a carpet company.  (Tr. 44, 157, 184-185, 187, 233-234).  Steppe was represented by an attorney at the hearing.  (Tr. 38).  Both Steppe and a vocational expert ("VE") testified.  (Tr. 43-89).

In a decision dated June 23, 2011, the ALJ performed the required five step sequential analysis and found Steppe was not disabled as defined in the Social Security Act ("Act"), through the date of his decision.  (Tr. 21-30).  At Step One, the ALJ decided Steppe had not engaged in substantial gainful activity since December 3, 2007.  (Tr. 23). At Step Two, the ALJ determined Steppe had the following severe impairments: generalized anxiety disorder; depression; and insomnia.  (Tr. 24).  At Step Three the ALJ held that Steppe did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. §§ 404.1520, 404.1525, 404.1526.  (Id.)  The ALJ also found Steppe retained the residual functional capacity ("RFC") to perform a "full range of work at all exertional levels but with the following nonexertional limitations: The claimant is able to perform simple, routine, repetitive tasks, and is able to concentrate and persist for two hour segments.  The claimant is unable to meet fast paced, high production demands." (Tr. 25).  In arriving at this determination, the ALJ held that Steppe's testimony was not altogether credible.  (Tr. 26-28).  At Step Four, the ALJ decided Steppe could not perform any past relevant work.  (Tr. 29).  Finally, at Step Five, after considering Steppe's RFC, his age, education, work experience and the VE's testimony, the ALJ concluded that there were other jobs that existed in significant number in the national economy that Steppe could perform.  (Tr. 29-30).  Based on the Medical-Vocational Guidelines, 20 C.F.R. Part 4, Supart P, Appendix 2, and the testimony

of the VE, the ALJ decided Steppe could perform work available in the national economy, such as a golf range attendant, hand packager, and library page.  (Tr. 29-30).

Accordingly, the ALJ held that Steppe had not been under a disability within the meaning of the Act from his alleged December 3, 2007 disability onset date, through the June 23, 2011 date of the ALJ's decision.  (Tr. 28).  Steppe sought review of the ALJ's decision and on December 30, 2011, the Appeals Council denied his request.  (Tr. 17, 1).  Accordingly, the ALJ's June 23, 2011 decision is the final decision of the Commissioner.  Steppe filed this action for judicial review on February 15, 2012.  (Doc. 1).

On appeal, Steppe argues that the ALJ did not properly consider testimony concerning his physical and mental impairments.  (Doc. 13 at 16-19, 22-23).  He maintains that the ALJ failed to properly weigh the medical evidence.  (Doc. 13 at 19-22).  He argues that the ALJ did not properly evaluate his credibility (Doc. 13 at 22-24), and finally, that the ALJ relied upon flawed VE testimony.  (Doc. 13 at 24-25).

II.     **Jurisdiction.**

Steppe has exhausted all available administrative remedies and he timely filed this action.  Accordingly, the case is properly before this Court which has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

III.    **Standard of Review.**

To be entitled to DIB, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C.

§ 1382c(a)(3)(A).  A "physical or mental impairment" under the Social Security Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

In determining whether an individual is disabled, the ALJ applies the five step sequential evaluation process established by the Social Security Administration and set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  Using the evaluation process, the ALJ must determine whether the claimant (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy.  See Phillips v. Barnhart, 357 F.3d 1232, 1237-1240 (11th Cir. 2004).  The claimant bears the burden of persuasion through step four and at step five the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Phillips, 357 F.3d at 1241 n.10.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's findings are supported by substantial evidence.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla but less than a preponderance.  It is such relevant evidence that a reasonable person would accept as adequate to support a conclusion." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted).

When the Commissioner's decision is supported by substantial evidence the district court will affirm even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). The district court "may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" Id. "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." Foote, 67 F.3d 1533, 1560 (11th Cir. 1995) (per curiam); accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (the court must scrutinize the entire record to determine the reasonableness of the factual findings).

There is a presumption in favor of the ALJ's findings of fact but no such presumption attaches to the ALJ's conclusions of law. Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). The Court will reverse a final decision if the ALJ incorrectly applied the law, or failed to provide sufficient reasoning for the Court to determine whether the ALJ properly applied the law. Keeton v. Dep't of Health & Human Serv's, 21 F.3d 1064, 1066 (11th Cir. 1992).

When it reviews a final decision, the Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with our without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## IV.    Statement of Facts

I have reviewed the record, including a transcript of the proceedings before the ALJ, the exhibits, the administrative record, and the pleadings and memoranda submitted by the parties. I find the facts are adequately set forth in the parties' memoranda and the

ALJ's decision.  Therefore, I will only summarize the pertinent portions of the record to protect Steppe's privacy to the extent possible.

### A. Steppe's Hearing Testimony

Steppe testified that he lost his job as a field representative for a carpet company after his performance suffered as a result of his mental problems.  (Tr. 73).  He filed for unemployment, hoping he could go back to work, but admitted that in fact, he did not feel he could work.  (Tr. 52-53).  Steppe testified to depression caused by the anxiety of not being able to sleep.  (Tr. 57).  He said he was unable to work as a result of his mood, which fluctuates from crying, to doing nothing, to being "short" with others, and that he is unable to predict his emotional state on a daily basis.  (Tr. 71).  He said every day is different; he doesn't know emotionally how he is going to be and his state can change during the day.  (Tr. 63).  Steppe related that he sometimes walks around his house trying to talk to his sons on the phone, while at other times he takes the cans out of the cabinet and makes sure all the labels are straight.  (Id.)  He testified that his sleep is fragmented, meaning he may sleep for half an hour before waking up and being unable to get back to sleep.  (Id.)  He is able to care for himself including his personal hygiene and grooming; he fixes simple breakfasts; and can load and unload the dishwasher, but he doesn't do laundry because of a fear of touching dirty clothing.  (Tr. 64-65).  He does not do any cleaning, washing dishes, or yard work.  (Tr. 65-66).  Steppe testified that he rarely drives and it took him an hour and a half to drive to the hearing even though he lived 11 miles away because he does not like driving around other people and frequently pulls over to let others pass him.  (Tr. 46-47).  He said he used to play racquetball, but had not played in the two to three years preceding the hearing.  (Id.)  He did yoga once, but his difficulty driving prevented him from returning for additional sessions.  (Tr. 71).  The only trip

Steppe had taken since December 2007 was to Arizona when his grandchild was born.

(Tr. 66-67, 80).  He took medicine for the trip and when he arrived he spent all four days

inside his son's house.  (Id.)  He testified that his medication causes him to feel

"drugged." (Tr. 70).  He said he tries to read, but cannot remember the first paragraph by

the time he gets to the second paragraph of whatever he is reading.  (Tr. 67-68).  He also

reported pain involving his right shoulder, right hand, and feet. (Tr. 78).  He said he could

not lift a half-gallon of milk with his right arm and that he had problems standing because

of nerve damage in his right foot. (Tr. 78-79).

### B. Hendrick Dinkla, M.D. – Treating Neurologist

Dr. Hendrik Dinkla is the physician who has given Steppe the most care.  (Tr. 53).

Dr. Dinkla is a board certified neurologist with a specialty in sleep medicine (www.ama-

assn.org).  He has treated Steppe for fifteen or twenty years.  (Tr. 54).

On June 28, 2007, Dr. Dinkla evaluated Steppe for a "follow-up" examination.[2]  (Tr.

401).  Steppe told the doctor he could not initiate sleep without his medications and that

Steppe and his wife slept in separate rooms because of Steppe's snoring.  (Id.)  Dr.

Dinkla recommended Steppe have a sleep study and said he could use Ambien to help

him sleep. (Id.)

Steppe saw Dr. Dinkla again on January 3, 2008, approximately a month after his

alleged disability onset.  The doctor noted Steppe "certainly has had no problems;"

Steppe looked "quite good;" and his only medical problem was skin lesions from years of

sun overexposure. (Tr. 289, 474).  The doctor noted Steppe had agreed to undergo a

sleep study.  (Tr. 289).

On June 3, 2008, Dr. Dinkla recorded that Steppe was interested in surgical

_____

[2] This is the earliest record from Dr. Dinkla in the certified administrative transcript.

treatment for obstructive sleep apnea.[3]  (Tr. 297).  The doctor encouraged Steppe to attempt treatment with positive airway pressure before undergoing surgery and noted that Steppe was not sleepy during the day.  (Id.)

A diagnostic polysomnogram (sleep study) performed on June 5, 2008 revealed elevated apnea/hypopnea index with oxygen desaturation as low as 86%,[4] an absence of slow wave sleep and significant reduction in REM sleep, frequent arousals, and periodic limb movements.  (Tr. 290-291).

On June 6, 2008, Steppe underwent a sleep study with use of CPAP[5] that revealed sleep efficiency of 94.3%, reduction of apneas, oxygen saturation above 93%, and alpha intrusions.[6]  (Tr. 293-294).  The sleep study showed Steppe's obstructive sleep apnea was mild to moderate.  (Tr. 296).  Steppe had a fair response to positive airway pressure, with "excellent sleep sufficiency" at optimal pressure. (Id.)

On October 21, 2008, Steppe told Dr. Dinkla that despite compliance with his CPAP he was not sleeping well.  (Id.)  Dr. Dinkla recommended a low dose of Neurontin.[7]

---

[3] The temporary absence of breathing during sleep. Taber's, p. 144. It is a leading cause of daytime sleepiness (http://www.nhlbi.nih.gov/health/dci/Diseases/SleepApnea/SleepApnea_WhatIs.html).

[4] A range of 96% to 100% is generally considered normal. The margin between "healthy" saturation levels (95-98%) and respiratory failure (usually 85-90%) is narrow. If oxyhemoglobin is low (below 90%) inadequate amounts of oxygen will reach body cells (http://www.favoriteplus.com/oxygen-saturation.php).

[5] Nasal CPAP delivers air into the airway through a specially designed nasal mask that is worn while sleeping. The Merck Manual 17th Ed., p. 1415.

[6] Alpha intrusions have been correlated to increased fatigue in patients with other sleep disorders. Alpha-delta sleep in patients with a chief complaint of chronic fatigue. Southern Medical Journal. 87(4) (http://journals.lww.com /smajournalonline/Abstract/1994/04000/Alpha_Delta_Sleep_in_Patients_With_a_Chief.8. aspx).

[7] Neurontin is indicated for the treatment of seizures (www.rxlist.com). It has also been found to treat neuropathic pain. New England Journal of Medicine, March 31, 2005, pg. 1324-1325.

The doctor diagnosed generalized anxiety disorder, possible constitutional insomnia, probable sleep misperception, and obstructive sleep apnea.  While Steppe reported poor sleep, Dr. Dinkla opined that he may only perceive that he is awake due to alpha intrusions, because it is clear that he sleeps.  (Id.)

At the next visit on March 31, 2009, Steppe told Dr. Dinkla he had stopped taking Neurontin because it "slowed him down" and made him feel "stupid." (Tr. 360).  The doctor wrote that Steppe's sleep disorder was interfering with his concentration and ability to function during the day and prescribed Seroquel.[8]  (Id.)

On April 14, 2009, Dr. Dinkla completed a short form at the request of the Social Security Administration in which he reported that Steppe did not have a mental impairment.  (Tr. 354).

On May 27, 2009, the doctor completed a more detailed report for the Administration in which he noted anxiety on a daily basis.  (Tr. 354, 287).  Dr. Dinkla said Steppe did not have any debilitating problems with concentration but his concentration could be affected during episodes of anxiety.  (Id.)  The doctor wrote that, from a neurological standpoint, he did not know of any impairment and that Steppe had no work related limitations.  (Tr. 287-288).

On March 31, 2009, Steppe told Dr. Dinkla he was suffering from insomnia.  (Tr. 360).

On June 23, 2009, Steppe saw Dr. Dinkla for a follow up concerning his generalized anxiety disorder and chronic insomnia.  (Tr. 396).  The doctor described Steppe as awake, alert, pleasant, appropriate, and without evidence of generalized or

---

[8] Seroquel is typically used to treat delusions, hallucinations, unorganized thoughts, and hostility (www.rxlist.com).

focal cognitive deficit.  (Id.)  Steppe reported continued difficulties in daily functioning resulting from his sleep problems and once again, Dr. Dinkla wrote that he did not necessarily think Steppe had true insomnia; rather, Steppe had a perception of lack of sleep due to alpha intrusion.  (Id.)  The doctor said he was unaware of any effective treatment for this condition. (Id.)

On September 24, 2009, Steppe complained to Dr. Dinkla of extreme anxiety and lack of concentration, which he attributed to his sleep problems.  (Tr. 95, 468).  Dr. Dinkla recommended Steppe see a psychiatrist and, while the doctor opined that Steppe probably could not hold a job at that time, he noted that he is not a psychiatrist.  (Tr. 468).

On February 18, 2010, Steppe told Dr. Dinkla he had begun treatment with a psychologist and reported no change in his symptoms.  (Tr. 570).  Dr. Dinkla prescribed a low dose of Citalopram.[9]

On August 19, 2010, Steppe reported continued problems with sleep on his medications with periods of not sleeping for two to three days followed by a "crash" when he slept through the night.  (Tr. 569). Other nights Steppe said he only got four to five hours of fragmented sleep.  Dr. Dinkla said there was no other treatment he could suggest. (Id.).

Dr. Dinkla completed a Sleep Disorders Impairment Questionnaire dated August 26, 2010.  (Tr. 573-577).  In response to the questions in the questionnaire, Dr. Dinkla diagnosed obstructive sleep apnea, constitutional insomnia, and generalized anxiety.  (Tr. 573).  The doctor reported clinical findings included sleep apnea and insomnia.  He cited to sleep studies that supported his diagnoses.  (Tr. 574).  The doctor said Steppe's primary symptoms were anxiety and insomnia.  (Id.)  He opined that Steppe is not a

---

[9] Celexa (Citalopram) is indicated for the treatment of depression (www.rxlist.com).

malingerer, (Tr. 575), and that he is capable of handling low stress.  (Tr. 576).  The doctor said Steppe likely needed unscheduled breaks to rest at unpredictable intervals during an 8-hour day.  (Tr. 577).  He also reported that Steppe had good days and bad days. (Id.) Dr. Dinkla did not believe Steppe's insomnia caused any non-exertional limitations and said Steppe was able to handle simple instructions; maintain attention in two hour segments; and perform at a consistent pace.  (Tr. 576).  He opined that Steppe was capable of low stress work.  (Tr. 576).

On December 2, 2010, Steppe told Dr. Dinkla he was "a bit better."  (Tr. 578).  The doctor noted Steppe had recently had surgery on his nose and had started yoga.  The doctor continued Steppe on Xanax and Ambien and opined there was no further treatment available.  He said Steppe's complaints of lack of sleep were not consistent with the sleep study findings and he attributed this to alpha intrusions. (Tr. 578).  The doctor said Steppe has the perception that he is not sleeping when in fact, he is.  (Id.)

### C. Psychiatrist  Fariya Afridi

Fariya Afridi, M.D.,[10] evaluated Steppe on October 14, 2009.  (Tr. 515).  At that time, Steppe reported chronic sleep problems, which Dr. Dinkla had been unsuccessful at treating with various medications.  Steppe also complained of anxiety during the day with difficulty focusing and concentrating.  Steppe said he was taking Xanax and Ambien. Steppe reported he is a very social person, has a lot of friends and goes out and enjoys social gatherings.  (Id.)  Dr. Afridi observed a somewhat anxious mood and affect, and diagnosed primary insomnia and anxiety disorder.  (Id.) No treatment recommendations were made.  (Tr. 516).

When she examined Steppe on December 15, 2009, Dr. Afridi found his primary

---

[10] Dr. Afridi is a board certified psychiatrist (www.ama-assn.org).

complaint was sleep problems.  (Tr. 514-515).  Steppe reported being "somewhat

anxious" during the day, denied panic attacks and said he was weaning off Xanax.  (Tr.

515).  He complained of increased difficulties with sleep with no more than 2-3 hours of

sleep a night despite taking Xanax and Ambien.  Dr. Afridi diagnosed insomnia and said

once Steppe was off Xanax, she would try Restoril.  (Id.)

### D. Rafael Parlade, Ph.D

Psychologist Rafael Parlade evaluated Steppe on December 3, 2009.  (Tr. 651).

Steppe reported long-standing problems with insomnia and anxiety.  (Id.)  A mental status

examination revealed symptoms of anxiety and restlessness.  (Tr. 652).  Steppe's verbal,

performance and full scale IQ scores on the Wechsler Adult Intelligence Scale-III were

average.[11]  (Tr. 368, 511).  Additional psychological testing produced below average

scores in the area of visual motor coordination.  (Tr. 654).  Steppe seemed to have

difficulty with tasks that require flexibility and he showed low frustration tolerance.  On the

Wechsler Memory test, he had difficulties with flexibility, attention span, and frustration.

The MMPI-II[12] revealed findings consistent with anxiety, depression, and problems with

social situations.  (Id.)  On the Beck Depression Inventory,[13] Steppe reported feeling

_____

[11] The WAIS-III is an individually administered test designed to measure the
intellectual ability to adults age 16 to 89 (www.nifl.gov/readingprofiles/WAIS_pop.htm).
[12] Minnesota Multiphasic Personality Inventory (MMPI) is a test that has been
useful in the fields of mental health, medicine, education, job placement, and counseling.
It contains 550 statements that describe a wide variety of  thoughts, feelings, attributes,
and life experiences. The test requires the individual to answer "true" or "false" to each
statement. The responses are measured against those of "normal" adults or adolescents.
Taber's Cyclopedic Medical Dictionary 19th Ed., ("Taber's"), p. 1562.
[13] The Beck Depression Inventory ("BDI") is a 21-item test presented in multiple
choice format which purports to measure presence and degree of depression in
adolescents and adults. Each of the 21-items of the BDI attempts to assess a specific
symptom or attitude "which appear(s) to be specific to depressed patients, and which are
consistent with descriptions of the depression contained in the psychiatric literature"
(http://cps.nova.edu/~cpphelp/BDI.html).

discouraged, loss of pleasure, loss of interests, restlessness, indecisiveness, loss of energy, irritability, and significantly disturbed sleep. (Tr. 655). He had average scores in differentiating between essential and non-essential details, abstract thinking, numerical concept formation, social judgment, concentration, and processing speed. (Id.) Steppe had initial difficulties acquiring information when visually presented, but once learned, he could appropriately recall it. (Id.) Dr. Parlade diagnosed an anxiety disorder as well as insomnia which both exacerbated Steppe's emotional reactions and was affected by those reactions. (Id.) No evidence of severe cognitive deficits or memory disturbances was noted in the test scores. (Tr. 366). The doctor recommended medication management and psychotherapy. (Id.)

Steppe saw Dr. Parlade on January 7, 2010 for assistance with insomnia and anxiety. (Tr. 650). Together, they discussed cognitive and relaxation strategies. (Id.) Steppe reported continued sleep problems with enhanced levels of stress at night. Dr. Parlade diagnosed generalized anxiety disorder and primary insomnia and advised Steppe to continue treatment. (Id.)

On March 9, 2010, Steppe complained of sleep disturbance, which Dr. Parlade noted was improved with medication and stress management. (Tr. 647). A mental status examination revealed an anxious mood and affect. (Id.) Dr. Parlade diagnosed generalized anxiety disorder and insomnia with a GAF score of 60.[14] (Tr. 649). Steppe's

---

[14] A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM p. 34. A GAF score of 51-60 denotes "[m]oderate symptoms (flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (few friends, conflicts with peers or co-workers).

memory, attention, and thought processes were normal, and his judgment and insight were intact.  (Id.)  Dr. Parlade noted that Steppe was active, playing racquetball three times a week and also playing golf.  (Tr. 647).

When seeing Dr. Parlade for follow-up on May 12 and August 5, 2010, Steppe complained of symptoms of depression, anxiety, and insomnia, and Dr. Parlade assessed a GAF of 60.  (Tr. 641, 644-645).  On May 12, 2010, Steppe complained of excessive worrying, daily sleep disturbances, and depressive symptoms.  (Tr. 644).  No changes in his diagnoses or treatment were noted.  (Tr. 645).  Upon examining Steppe on August 5, 2010, Dr. Parlade found Steppe's memory and attention were normal, and his insight and judgment intact.  (Tr. 642).  Steppe reported a depressed mood, feelings of hopelessness, fatigue, poor sleep, anxiety, and excessive worry.  (Tr. 641).  A mental status examination revealed a depressed mood and affect.  (Tr. 642).  Dr. Parlade diagnosed generalized anxiety disorder, insomnia, and depression.  In both May and August, 2010, Dr. Parlade recorded that Steppe was active, playing racquetball three times a week, and playing golf.  (Tr. 641, 644).

Dr. Parlade completed a Psychiatric/Psychological Impairment Questionnaire dated August 12, 2010.  (Tr. 561-568).  In response to the questions in the questionnaire, the doctor diagnosed generalized anxiety disorder, insomnia, and depression.  (Tr. 561).  He assigned Steppe a GAF score of 60 and gave him a guarded prognosis.  Dr. Parlade reported that Steppe's lowest GAF in the past year was 60.  (Tr. 561, 564).  The doctor also reported clinical findings of sleep disturbances, difficulty thinking or concentrating, decreased energy, and generalized persistent anxiety.  (Tr. 562).  The doctor said

Diagnostic and Statistical Manual of Mental Disorders 4th Ed. Text Revision, ("DSM") p. 34.

Steppe's primary symptoms were insomnia and anxiety. (Tr. 563). Dr. Parlade opined that Steppe was markedly limited in his ability to maintain attention and concentration for extended periods and in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 564). Dr. Parlade felt Steppe was not a malingerer. (Tr. 567). He noted that Steppe's anxiety and insomnia exacerbated each other. The doctor said Steppe had good days and bad days, and he estimated Steppe would be absent from work on average, more than three times a month as a result of his impairments or treatment. (Tr. 568).

On September 2, 2010, Steppe saw Dr. Parlade for a follow-up visit. (Tr. 638). Steppe reported his depressive symptoms were "stable" with continued depressed mood, loss of interest and pleasure in activities, ongoing anxiety and insomnia. No changes were made in his diagnoses or treatment plan. (Tr. 639-640). Dr. Parlade reported unchanged findings at the next visit, on November 2, 2010. (Tr. 635-637). At follow-up appointments in September and November, 2010, Dr. Parlade recorded symptoms of depression, anxiety, and insomnia that were stable, assessed GAFs of 60, and made no changes to Steppe's treatment. (Tr. 635-640). The doctor continued to note that Steppe was active, playing racquetball up to three times a week and playing golf. (Tr. 635, 638). Upon examining Steppe on November 2, 2010, the doctor found his memory, attention, and thought processes normal, and his judgment and insight intact. (Tr. 636).

On January 20, 2011, Steppe said he had used yoga as well as other cognitive and relaxation techniques for his anxiety. (Tr. 632). Steppe reported improvement in his depressive symptoms but said he continued to have anxiety problems with excessive worrying. (Id.) He was diagnosed with depressive disorder and anxiety disorder with a

GAF score of 65.[15] (Tr. 633).  Again, Steppe was noted to be active, playing golf and, three times a week, racquetball.  (Tr. 632).  Steppe was alert, oriented, and pleasant, with good insight and judgment.  (Id.)   (Tr. 633).  Dr. Parlade did not recommend any changes to Steppe's treatment. (Tr. 633-634).

In a letter dated January 31, 2011, Dr. Parlade wrote that he was treating Steppe for outpatient psychotherapy to help him with emotional reactions and adjustment to insomnia and other stressors.  (Tr. 579).  His diagnoses were generalized anxiety disorder, depressive disorder, and insomnia.  Dr. Parlade wrote that Steppe had gained insight into his situation through various cognitive, behavioral, and relaxation strategies, but he continued to have difficulties with anxiety and depression.  Further treatment was indicated.  (Id.)

### E.  Noel Figueroa, M.D. - Examining Psychiatrist[16]

On March 31, 2011, on referral by his attorneys, Steppe saw psychiatrist Dr. Noel Figueroa.  (Tr. 599).  In speaking with Dr. Figueroa, Steppe denied having hobbies or exercising, he appeared anxious and almost annoyed, and said he felt cameras were sometimes watching him.  (Tr. 601-602).  The doctor noted Steppe had complained of problems with sleep for many years, along with forgetfulness and irritability.  (Tr. 599).  Steppe told Dr. Figueroa he had managed to perform his last job because of the flexible hours, but eventually his symptoms became progressively worse and precluded even this work. (Id.)  Steppe said he had a variable mood on a day-to-day basis. (Tr. 600).  A mental status examination revealed Steppe had a serious demeanor, short answers, an anxious appearance, depressed and anxious mood with congruent affect, a blunted affect

---

[15] A GAF score of 61-70 indicates some mild symptoms. DSM, p. 34.

[16] Dr. Figueroa is a board certified psychiatrist (www.ama-assn.org).

with underlying irritability, and some paranoia of being watched. (Tr. 600-601).  Dr. Figueroa diagnosed major depressive disorder, moderate, recurrent, primary insomnia, history of hypercholesterolemia, and sleep apnea.  (Tr. 601).  The doctor gave Steppe a GAF score of 49.

Dr. Figueroa completed a Psychiatric/Psychological Impairment Questionnaire on Steppe in which he gave a "guarded" prognosis.  (Tr. 603).  Clinical findings included poor memory, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, a blunt affect, decreased energy, and irritability.  (Tr. 604).  Steppe's primary symptoms were depressed mood, sleep disturbances, anxiety, poor concentration, low energy, anhedonia, irritability, and feelings of worthlessness.  (Tr. 605).  Dr. Figueroa found these symptoms and limitations were present for the past three years.  (Tr. 610).

Dr. Figueroa opined that Steppe was markedly limited in his ability to understand, remember, and carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; his ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; his ability to accept instructions and respond appropriately to criticism from supervisors; and, his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 606-607).  Dr. Figueroa also said Steppe experienced episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from the situation and/or experience an exacerbation of

signs and symptoms due to up and down symptoms from depression, insomnia, and anxiety.  (Tr. 608).  The doctor opined that Steppe is not a malingerer.  (Tr. 609).  He felt Steppe's sleep disturbance and psychiatric symptoms exacerbated each other.  The doctor said Steppe was incapable of handling even low stress work due to sleeping only three hours a night, depression, and anxiety with low frustration tolerance.  He observed that Steppe had good days and bad days and estimated that Steppe would be absent from work more than three times a month.  (Tr. 610).

### F.  Linda O'Neal, Ph.D.

Linda O'Neal, Ph.D. is a non-examining state psychologist.  (Tr. 414).  She reviewed Steppe's claim file on August 23, 2009.  Dr. O'Neal indicated that she reviewed some of the records from the treating neurologist and forms completed by Steppe regarding his activities, but she did not review any of Steppe's psychiatric treatment records.  (Id.)  Based on the records she reviewed, Dr. O'Neal opined that Steppe had moderate limitations in maintaining concentration, persistence, or pace.  (Tr. 412).  She found moderate limitations in Steppe's ability to carry out detailed instructions; his ability to maintain attention and concentration for extended periods; and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 416-417).  But, Dr. O'Neil opined that Steppe's limitations in daily living and social functioning were mild.  (Tr. 402, 412, 416).  She explained that Steppe had limitations in his ability to concentrate for extended periods, but that he was capable of simple tasks, as well as probably some detailed, non-production tasks.  (Tr. 418).  Dr. O'Neal felt that from a psychiatric perspective, Steppe was capable of simple, repetitive, routine tasks and was not substantially limited.  (Tr. 418).

### G. Eric Weiner, Ph.D.

Eric Weiner is another non-examining state psychologist.  (Tr. 555).  He reviewed Steppe's claim file on April 10, 2010.  Dr. Weiner found the same limitations that were reported by Dr. O'Neal.  (Tr. 553, 557-558).  Dr. Weiner opined that Steppe seemed capable of independently performing routine tasks in a low demand environment (Tr. 559).

### H. George Telesh, M.D. - Treating Orthopedic Surgeon[17]

On March 11, 2008, Dr. Telesh evaluated Steppe for complaints of left knee pain. (Tr. 341).  Steppe attributed the pain to striking his knee while docking a boat two weeks earlier.  (Tr. 341).  He said his pain had diminished since his injury, he felt better with exercise, and had no instability.  (Tr. 341).  An examination revealed mild tenderness of the patellar tendon, tight quadriceps, and tight heel cords bilaterally.  X-rays showed mild joint space narrowing of the left knee. (Id.)  Dr. Telesh diagnosed left knee pain, early left knee osteoarthritis, tight heel cords, and tight quadriceps.  (Tr. 342). He advised Steppe to take Celebrex[18] and start physical therapy.  (Id.)  Steppe's next appointment was scheduled to accommodate Steppe's imminent ski trip (Tr. 342).

On December 22, 2008, Steppe complained that he had experienced right shoulder pain for the past several months but he did not complain of left knee pain.  (Tr. 326).  Steppe also reported pain from playing racquetball three times a week.  (Id.)  An examination revealed tenderness over the bicipital tendon, long head with a positive impingement sign and X-rays showed hypertrophy of the AC joint.  (Id.)  Dr. Telesh diagnosed chronic tendonitis, bursitis, and impingement syndrome of the right shoulder,

---

[17] Dr. Telesh is a board certified orthopedic surgeon (www.ama-assn.org).

[18] Celebrex is indicated for the treatment of arthritis and acute pain in adults (www.rxlist.com).

rule-out rotator cuff tear.  (Id.)  He administered a shoulder injection.  (Id.)  An MRI of Steppe's right shoulder performed later that day showed tendinopathy of the distal supraspinatus and infraspinatus tendons, moderate acromioclavicular joint arthrosis, and moderate biceps tendinopathy.  (Tr. 327).  The following day, Steppe reported continued shoulder pain and some right knee pain.  (Tr. 322).  He said he had "a little discomfort" in his right knee, on which he used ice occasionally.  (Tr. 322, 435, 485).  While Steppe was given an injection for pain because he was "rather insistent," his knee had a good range of motion and no swelling or effusion (Tr. 322, 436).  Steppe also complained that his left shoulder was "a little bit uncomfortable," "really [was] not bothering him that much" and was "just enough to be annoying" (Tr. 322, 435). X-rays of the left shoulder showed early degenerative change at the acromioclavicular joint and possible deformity.  Steppe received shoulder steroid injections, and confessed that in the past he had not complied with instructions to rest.  (Tr. 322-323, 339, 435-436).

On January 23, 2009, Steppe said the shoulder injection helped quite a bit, but he continued to have some shoulder pain and more significant pain involving his right knee. (Tr. 336).  An examination of Steppe's knee revealed an increase in warmth medially with tenderness over the anterolateral joint line and over the pes anserine tendons and bursa, and the gastrocnemius[19] was very tight.  (Id.)  Dr. Telesh diagnosed synovitis[20] of the right knee, contracture gastrocnemius of both legs, pes anserine bursitis of the right knee, rule-out internal derangement of the right knee, AC arthritis of the right shoulder, and

---

[19] The big muscle at the back of the lower leg (http://www.sportsinjuryclinic.net/cybertherapist/back/backlowerleg/calfstrain.htm).

[20] A usually painful inflammation of a synovial membrane. Characterized by swelling due to hypertrophy of the synovium and overproduction of synovial fluid. Orthopaedic Dictionary, Stanley Hoppenfeld, M.D., and Michael Zeide, M.D., J.B. Lippincott Company, 1994 ("OD"), p. 387.

tendonitis of the right shoulder.  (Id.)  Steppe said he was hoping his knee would improve so he could go skiing in April.  (Id.)  An MRI of Steppe's right knee on February 2, 2009 revealed an undersurface tear involving the posterior horn and body of the medial meniscus and probable grade I chondromalacia[21] of the medial femoral condyle with a small joint effusion.[22]  (Tr. 348).

On February 19, 2009, Steppe said he felt better and had played racquetball several times without problems.  (Tr. 335).  He was advised to limit his activities as tolerated to try and stretch his gastrocnemius.  (Id.)  On August 27, 2009, Steppe was seen because of a ganglion cyst on his right ankle.  (Tr. 421).  He reported his right knee was "doing pretty well," (Tr. 421), but complained of swelling in his right ankle for approximately one year.  (Id.)  Examination revealed some tenderness over the lateral iliac crest, swelling laterally of the right lateral malleolus, and very tight gastrocnemius bilaterally.  (Id.)  X-rays of Steppe's ankle and foot showed a small calcaneal spur.  (Id.)  An MRI on September 1, 2009 showed a multiloculated cystic mass in Steppe's ankle.  (Tr. 423).  On October 1, 2009, Dr. Telesh's examination revealed swelling and warmth of the right ankle.  (Tr. 478).  The doctor diagnosed ganglion of the right ankle, aspirated the ankle, and injected Dexamethasone.[23]  (Tr. 479). Steppe saw Dr. Telesh for follow-up on January 7, 2011 at which time he complained of left elbow pain.  (Tr. 614).  Examination revealed medial epicondyle tenderness.  (Tr. 615).  Dr. Telesh diagnosed elbow pain and

---

[21] A pathological state of softening with fibrillation, fissuring, and erosion of articular cartilage. OD, p. 61.

[22] Increased fluid in the patella joint cavity generally associated with arthritic disease. Taber's, p. 668.

[23] Dexamethasone (Decadron) is indicated for the treatment of rheumatic conditions (www.rxlist.com).

medial epicondylitis. (Id.) Steppe was given a splint and prescribed Naproxen.[24]  (Tr. 616).  An MRI of Steppe's left elbow dated January 26, 2011 showed tendonitis. (Tr. 617). On February 3, 2011, Steppe reported continued elbow pain.  (Tr. 611).  An examination revealed tenderness and Dr. Telesh performed a steroid injection.  (Tr. 612-613).

### H.  Charles Williamson, M.D. - Treating Orthopedic Surgeon[25]

Dr. Williamson evaluated Steppe for right knee pain on March 26, 2009.  (Tr. 359). Upon examination, Dr. Williamson noted occasional clicking on the right side and some medial joint line tenderness on the right. (Id.)  The doctor reviewed previous x-ray and MRI findings and diagnosed internal derangement of the right knee with tear of the medial menscius, chondromalacia of the medial compartment, and osteochondroma of the posterolateral right fibula.  (Tr. 358).  Dr. Williamson recommended arthroscopic knee surgery. (Id.)

On April 15, 2009, Dr. Williamson saw Steppe on complaints of right shoulder pain he attributed to playing racquetball.  (Tr. 357).  Examination revealed right shoulder limited motion on internal rotation, adduction and extension, positive biceps resistance test, and anterior and lateral impingement signs on the right. (Id.)  The doctor reviewed Steppe's MRI findings and recommended physical therapy.  (Tr. 356).  The following day Steppe attended physical therapy.  (Tr. 373).  Steppe reported a painful range of motion in his right shoulder to the therapist.  (Id.)  Steppe said he would continue exercises on his own or at a gym.  (Tr. 370).  Still, he attended physical therapy again on April 23, 2009.  (Tr. 373).

Steppe saw a different doctor on March 26, 2009 who recommended arthroscopy.

---

[24] Naproxen is indicated for the signs and symptoms of osteoarthritis (www.rxlist.com).

[25] Dr. Williamson is a board certified orthopedic surgeon (www.ama-assn.org).

(Tr. 358).  Steppe did not want to have the surgery done until January because it would interfere with his activity schedule.  (Tr. 358).  Steppe was referred to physical therapy for right shoulder pain in April 2009, but was discharged in May 2009, after demonstrating overall improvement in his range of motion and strength, and not appearing for his final appointment.  (Tr. 356, 362, 369-371).  On April 28, 2009, Steppe told his therapist his shoulder felt "okay."  (Tr. 372). He felt like he no longer needed therapy and could improve by going to the gym. (Tr. 372).

     I.  <u>Matthew Hentzel, DPM – Treating Podiatrist</u>

Podiatrist, Matthew Hentzel began treating Steppe on January 15, 2010 (Tr. 665). Steppe told Dr. Hentzel he had been bothered by a cystic lesion in his right ankle for some time with associated pain.  Examination revealed point pain over the right ankle. Dr. Hentzel recommended surgical excision.  (<u>Id.</u>)

On February 16, 2010, Steppe complained of increased pain in his ankle following cyst removal surgery.  (Tr. 658).   Steppe said he had increased pain after going to the gym "completely against [his doctor's] advice," wearing flip flops instead of a surgical shoe, and not completing his antibiotic regimen.  (Tr. 658, 660, 662).  Dr. Hentzel diagnosed post-operative infection and non-compliance.  The doctor prescribed antibiotics and told Steppe to stay off his leg as much as possible.  (<u>Id.</u>)

On February 23, 2010, Steppe reported he was experiencing decreased pain.  (Tr. 657).  On April 6, 2010, Steppe complained of numbness on the lateral side of his foot. (Tr. 656).  When treated for elbow pain in 2011, it does not appear he mentioned any shoulder, knee, or ankle pain.  (Tr. 611-617, 668-670).

     J.  <u>David Guttman, M.D.</u>

Doctor David Guttman,[26] is a non-examining state agency medical consultant who reviewed Steppe's claim file on November 24, 2009 and concluded that Steppe did not have a severe physical impairment.  (Tr. 509).  Dr. Guttman said he reviewed a single treatment note dated October 1, 2009 relating to Steppe's right ankle and opined that Steppe did not have any severe physical impairments.  (Id.)

### K. Relevant Testimony by the VE

The VE testified that an individual of Steppe's age, education, and work history who was limited to simple, routine, repetitive tasks, who was limited to concentrating and persisting for two hour segments, and who was unable to meet fast-paced high production demands could not perform any of Steppe's past relevant work.  (Tr. 87).  The VE also testified that Steppe has no transferable skills from his past work.  (Tr. 88-89).

The VE opined that a person with Steppe's RFC could work as a medium-level golf range attendant, a hand packager, or a library page.  (Tr. 87-88).  But, the VE said if the subject missed work three times a month there would be no work he could perform.  (Tr. 89).  The VE also said an individual who has a loss in the ability to perform even one of the basic mental demands for unskilled work would be unable to perform any job.  (Tr. 88).

### VI. Discussion

### A. Subjective Complaints of Pain

According to Steppe, the ALJ's failure to find his physical impairments severe was error.  (Doc. 13 at 16).  He argues that the ALJ could only find his limitations non-severe if they had no effect on his ability to work, irrespective of his age education, or work experience.  (Id.) (citing Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir. 1987)).  The crux

_____

[26] Dr. Guttman is a pediatrician (www.ama-assn.org).

of Steppe's argument is that there is evidence his physical impairments cause at least a *de minimis* intrusion on his ability to work, and the ALJ improperly discounted this evidence.

At the administrative hearing, Steppe testified to problems with his right shoulder, right hand, and feet. (Tr. 78). He said he could not lift a half gallon of milk with his right hand because his arm "just won't go." (Id.) And, he said he had nerve damage on the side of his right foot resulting from surgery, which causes numbness. (Tr. 78-79). He also testified that he could only stand for 10-15 minutes before his foot falls asleep. (Tr. 79). Steppe denied telling any of his doctors his shoulder felt good or that he was playing racquetball. (Tr. 81). Now, he cites his testimony and evidence that he received joint injections and other pain medicine to prove "he suffers from *de minimis* physical limitations." (Doc. 13 at 18).

Steppe relies on his own subjective complaints of pain at the hearing and two entries in the record, both of which occurred in April of 2009, where he complained of pain in his right shoulder (Tr. 357, 373) as evidence that his physical impairments are severe. (Doc. 13 at 17). He also argues he has been prescribed medication for his pain. (Id. at 18). The evidence to support Steppe's claim does not change the outcome. The ALJ properly considered Steppe's medical record and afforded great weight to the opinions of his treating physicians. In the process, the ALJ properly considered and accounted for any medical evidence concerning Steppe's physical pain. The ALJ simply did not find Steppe's testimony credible or the remaining evidence persuasive.

"The finding of any severe impairment . . . is enough to satisfy step two because once the ALJ proceeds beyond step two he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." Burgin v.

Comm'r of Soc. Sec., 420 F. App'x 901, 902 (11th Cir. 2011) (citing Jamison v. Bowen,

814 F.2d 585, 588 (11th Cir. 1987)).  Although the ALJ did not find Steppe's physical

impairments severe, the ALJ considered those impairments in formulating Steppe's RFC.

Ultimately, the ALJ concluded that Steppe's complaints of pain were not credible, and that

the medical record did not support a finding that his impairments were severe, or a finding

that, in conjunction with his other impairments, Steppe was disabled.

The Eleventh Circuit has adopted a two-pronged standard for examining subjective

complaints.  First, the claimant must provide evidence of an underlying condition.  Next

he must submit either objective medical evidence confirming the severity of the alleged

pain or show that the objectively determined medical condition can reasonably be

expected to give rise to the claim.  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir.

2002).

If the ALJ discredits a claimant's subjective testimony, he must articulate explicit

and adequate reasons for doing so.  Id.  Here, the ALJ found Steppe's medically

determinable impairments could reasonably be expected to cause some of his alleged

symptoms, but after a thorough review of the evidence, the ALJ concluded that Steppe's

claims of disabling symptoms were inconsistent with the medical evidence in the record.

(Tr. 26-28).  The remaining issue is whether the ALJ articulated explicit and adequate

reasons for discounting Steppe's testimony.

The ALJ performed a thorough analysis of Steppe's condition and substantial

evidence weighs in favor of his opinion.  (Tr. 26).  Before reviewing the medical record,

the ALJ noted that when Steppe was asked to give reasons for his disability, he did not

mention any physical limitations.  The ALJ then reviewed the medical record and found

that despite Steppe's testimony, his physical limitations were minimal.

In January, 2009 Steppe told his treating orthopedic physician, Dr. Telesh, he still had some pain in his shoulder, but not very much.  The doctor wrote that Steppe's shoulder showed no appreciable tenderness and motion was good, but an MRI revealed Steppe had tendonitis.  Steppe told Dr. Telesh he wanted to fix his knee problems so he could go skiing in April.  Although Steppe said his knee was bothering him, an X-ray proved unremarkable.  Less than one month later, Steppe returned to Dr. Telesh and reported he "feels good.  His knees feel good, and his shoulder feels good also." (Tr. 335).  Steppe said he had played racquetball several times and had no particular problems.  An examination of his knee showed no swelling, no tenderness, and good range of motion.  Dr. Telesh determined that Steppe's knee had a slight meniscal tear, which he termed "insignificant."  The doctor recommended Steppe take part in activities as tolerated and return as needed.  (Id.)

In February 2010, sometime after surgery to remove a ganglion cyst from his right ankle, Steppe visited Atlantic Podiatry Associates for a post-op follow-up.  The doctor noted Steppe had "been wearing flip-flops and going to the gym . . . and is moving the foot completely against my advice to this point." (Tr. 658).  In April 2010, Steppe told the doctor at Atlantic Podiatry Associates he had some numbness on the side of his foot, but the physician noted Steppe was "fairly asymptomatic."  (Tr. 656).

The ALJ observed that on multiple occasions, Steppe told his doctors he played racquetball three times per week and that he also played golf.  Steppe did yoga once, reported that he worked out at the gym, and said he was going to go skiing.  (Tr. 326, 339, 352, 578, 632, 635, 638, 641, 644, 647).

The ALJ recognized that Steppe sought treatment for knee and shoulder pain and an ankle cyst but the ALJ found these impairments were non-severe because Steppe still had a normal range of motion and muscle strength.  (Doc. 13 at 17).

This is substantial evidence to support the ALJ's determination that Steppe's claims of severe physical problems and pain was not supported by the medical evidence and was not credible

### B.  Steppe's Credibility

In a separate but related argument, Steppe contends that the ALJ failed to properly evaluate his credibility.  Specifically, Steppe argues that the ALJ failed to consider his testimony using the factors listed in SSR 96-7p, which is the policy interpretation for assessing the credibility of an individual's statement.  Those factors are:

> the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

Id.

It is apparent from the ALJ's decision that he considered all the evidence.  The ALJ remarked that Steppe's testimony was not credible because Steppe stated at the hearing that he did not leave his house, but he told his physicians how social he is, that he played racquetball three times per week, he played golf, went to the gym, planned a ski trip and tried yoga.  At the hearing, Steppe denied telling a doctor that his shoulder felt good and

he testified that his skiing trip occurred before his alleged onset date, but this testimony is inconsistent with the medical record.

The ALJ listed other reasons for discounting Steppe's testimony.  While the receipt of unemployment benefits does not preclude receipt of DIB it is still a factor the ALJ must consider when determining a claimant's credibility.  (Doc. 13-1).  The ALJ found Steppe not credible because he applied for and received unemployment benefits from at least the beginning of 2009 through 2010.  To qualify for unemployment, Steppe had to state that he was looking for jobs and was ready, willing, and able to work.  At the hearing, Steppe testified that he was ready, willing, and able to work, but that he did not think he could work.  (Tr. 52-53).  Regardless of whether Steppe's representations made when he applied for unemployment compensation were true or his testimony at the hearing was true, Steppe's credibility was impeached.

Steppe's recreational physical activities which he reported to his doctors but which he denied at the administrative hearing also impeach Steppe's credibility.

Ultimately, the ALJ found Steppe's allegations of total disability were "far in excess" of the medical evidence of record.  A review of the record shows substantial evidence to support the ALJ's conclusion.  Because the ALJ considered the available evidence, and provided explicit and adequate reasons for finding Steppe's testimony inconsistent with the record as a whole, the ALJ acted within his discretion when he found Steppe less than credible.

### C.  Evaluation of the Medical Evidence

Steppe argues that the ALJ failed to articulate good cause for discrediting the opinion of his treating physician, Dr. Parlade, and his consulting physician, Dr. Figueroa. An ALJ must explain with particularity the weight he gives different medical opinions.

McCloud v. Barnhart, 166 F. App'x 410, 418 (11th Cir. 2006) (citing Sharfaz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987)).  Unless there is good cause to do otherwise, the ALJ must afford substantial weight to the opinions of a treating physician.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  "Good cause exits when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  A treating physician's opinion on the nature and severity of a claimant's impairments is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. §404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if "it is not accompanied by objective medical evidence or is wholly conclusory."  Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).

Steppe maintains that the ALJ improperly afforded little weight to his treating psychologist, Dr. Parlade.  He argues that Dr. Parlade's opinion should have been given controlling weight, and if not controlling weight, that it was entitled to more weight than the ALJ afforded.  Applying the factors listed in 20 C.F.R. § 404.1527(c),[27] Steppe asserts that Dr. Parlade treated him on a regular basis for over a year; that he was the mental

---

[27] Steppe asserts that the factors are listed under 20 C.F.R. § 404.1527(d).  A review of the regulation shows that the factors are listed under (c).

The factors listed in § 404.1527(c) that an ALJ should consider are: (1) whether the medical source examined the claimant; (2) whether the medical source was claimant's treating physician which includes consideration of the length of the treatment, the frequency of the examination, and the nature and extent of the treatment relationship; (3) whether the medical source presents relevant evidence to support his opinion; (4) how consistent the medical source's opinion is with the rest of the evidence of record; and (5) whether the medical source is a specialist.  20 C.F.R. § 404.1527(c)(1)-(5).

health source most familiar with Steppe's conditions; that Dr. Parlade provided detailed findings to support his opinions; that his medical findings are consistent with the record; and that he is a specialist in his field because he is a psychologist.  (Doc. 13 at 21). Accordingly, Steppe concludes the ALJ should have given Dr. Parlade's opinions considerable weight.  Steppe states that the ALJ "simply ignore[d]" making such an analysis under § 404.1527(c).  (Id.)

When Dr. Parlade filled out the psychological questionnaire in August 2010, he diagnosed Steppe with generalized anxiety disorder, insomnia, and depression and he said Steppe's prognosis was "guarded."  The doctor marked that Steppe had sleep disturbance, decreased energy, generalized persistent anxiety, and difficulty thinking or concentrating.  He rated Steppe's symptoms as markedly limiting Steppe's ability to work and he checked boxes indicating that Steppe was markedly limited in his ability to maintain attention and concentration for extended periods and the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance.  Dr. Parlade also reported that Steppe's impairments were ongoing and that Steppe was not a malingerer.  He wrote that insomnia would affect every aspect of Steppe's work, and that Steppe was likely to have good days and bad days, but the doctor declined to comment on whether Steppe could tolerate any work stress.  Finally, the doctor estimated Steppe was likely to be absent from work more than three times a month.  (Tr. 568).

The ALJ considered both Dr. Parlade's treatment records and the questionnaire and determined that what Dr. Parlade said in response to the questionnaire was not supported by the doctor's treatment records.  Those records show, among other things, that Steppe always had a GAF score of 60 or higher and that he possesses an average

IQ and memory.  According to the doctor's records, Steppe plays racquetball three times a week and also golf, both of which require attention and concentration.  The ALJ found Steppe's physical activities were consistent with his GAF scores, but inconsistent with the limitations ascribed by Dr. Parlade in the questionnaire.  Accordingly, although the ALJ credited Dr. Parlade's treatment records, the ALJ chose to give little weight to the August 2010 questionnaire.

A treating physician's opinion is not entitled to considerable weight if it conflicts with the claimant's own testimony regarding his daily activities.  Phillips, 357 F.3d at 1241.  Dr. Parlade's August 2010 opinion was conclusory and offered no clinical data or information to support his opinions.  See Edwards, 937 F.2d at 583.  The ALJ explained why Dr. Parlade's questionnaire responses were inconsistent with his treatment records as a whole, which do not show that Steppe's mental state rendered him unable to work.  Accordingly, there is good cause for the ALJ not to rely on Dr. Parlade's opinions expressed in the questionnaire.  See id. at 583-84.

Although Steppe argues that the ALJ did not consider the factors listed in §404.1527(c), it is apparent from the ALJ's opinion that the ALJ considered those factors.  The ALJ notes that Dr. Parlade is a treating physician, which shows the ALJ considered the length of Steppe's relationship with Dr. Parlade as well as the nature and extent of the treatment relationship.  20 C.F.R. § 404.1527(c)(2)(i-ii).  The ALJ also considered the consistency of Dr. Parlade's opinions with his own treatment records and with the rest of the medical record, thus satisfying the remaining § 404.1527(c) factors.  Accordingly, the record demonstrates that the ALJ followed § 404.1527 in coming to his decision.  The ALJ gave adequate reasons for discounting Dr. Parlade's August, 2010 opinions and the

ALJ was specific in describing what weight he afforded Dr. Parlade's August 2010 opinions.  Consequently, substantial evidence supports the ALJ's decision.

In addition to Dr. Parlade's opinion, the ALJ discounted the opinion of one-time examining consultant Dr. Figueroa.  The opinion of a physician who only examines a claimant once is not entitled to any great weight.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004).  The ALJ did not give credit to Dr. Figueroa's opinion because the doctor was a one-time consultant and because his evaluation is "flatly contradicted" by the medical evidence of record.  The ALJ noted that Steppe's activities of daily living reported to Dr. Parlade were inconsistent with the limitations found by Dr. Figueroa and that Dr. Figueroa assigned a GAF of 49 when Dr. Parlade, Steppe's treating physician, had assigned a GAF of 60-65 for the previous year and a half.  These reasons constitute good cause to discount the one-time evaluation by Dr. Figueroa.

Finally, because "the weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments," the ALJ did not err in finding Dr. Parlade and Dr. Figueroa's opinions unpersuasive to the extent they were inconsistent with the objective medical evidence, including Dr. Parlade's treatment records, as a whole.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); (Tr. 26).

### D.  The VE's Testimony

Steppe argues that the ALJ improperly relied on the VE's testimony because the ALJ did not pose a hypothetical question which comprises all of Steppe's impairments. Because the ALJ correctly accounted for Steppe's physical impairments and properly weighed the medical evidence in the record, the Court need only address Steppe's

complaint that the ALJ did not properly consider Steppe's limitations in concentration, persistence, or pace.

The ALJ found Steppe has moderate difficulties in this area.  In Steppe's RFC assessment and in the hypothetical posed to the VE, the ALJ limited Steppe to the performance of "simple, routine, repetitive tasks," and stated that Steppe "is able to concentrate and persist for two hour segments.  The claimant is unable to meet fast paced, high production demands."  Steppe argues that these limitations do not adequately account for his deficits in maintaining concentration, persistence or pace and consequently, the ALJ erred.

When the ALJ finds a claimant is limited in maintaining concentration, persistence or pace as part of the Psychiatric Review Technique, the ALJ must account for those limitations in the RFC assessment. Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180-81 (11th Cir. 2011); Moore v. Barnhart, 405 F.3d 1208, 1213-14 (11th Cir. 2005) (per curiam).  Limitations to simple routine tasks or unskilled work are typically not sufficient to account for a claimant's moderate limitations in concentration, persistence or pace.  See Winschel, 631 F.3d at 1180 (citing Stewart v. Astrue, 561 F.3d 679, 684-85 (7th Cir. 2009) (per curiam) (restricting hypothetical to simple, routine tasks that do not require constant interactions with coworkers or the general public insufficient to account for limitations of concentration, persistence and pace); Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2004) (limiting hypothetical to simple, one or two-step tasks does not account for deficiencies in concentration, persistence or pace); Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996) (limitation to simple jobs did not account for deficiencies of concentration, persistence, or pace)).

However, the Winschel court recognized that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." Id.; see also Jarrett v. Comm'r of Soc. Sec., 422 F. App'x 869, 872 (11th Cir. 2011).  The issue before the Court is whether there is substantial medical evidence relied on by the ALJ that Steppe can do "simple repetitive" tasks despite his moderate limitations in concentration, persistence or pace.

The ALJ relied on the medical evidence when formulating his hypothetical to the VE and Steppe's RFC.  For instance, Dr. Dinkla concluded that Steppe did not have a mental impairment and had no debilitating problems with his concentration, though his ability to concentrate could be affected during episodes of anxiety.  Steppe's intellectual testing showed he is in the average range of intellectual functioning.  Dr. Parlade noted average scores for concentration and processing speed, but slightly below average scores were noted in areas dealing with psychomotor speed, perception abilities, and instant recall.  On August 23, 2009, Dr. O'Neil found that while Steppe had moderate difficulties in maintaining concentration, persistence, or pace, a preponderance of the evidence suggested moderate but not marked limitations.  On April 10, 2010, Dr. Wiener said  Steppe was moderately limited in maintaining concentration, persistence, and pace, but after noting Steppe's test scores, concluded that Steppe had some secondary psychological issues that impose limits though less than marked.  Finally, the ALJ observed that Steppe plays racquetball three times a week and plays golf, activities which, the ALJ explained, require substantial attention and concentration.

The ALJ considered all the evidence relating to Steppe's limitations with respect to concentration, persistence or pace and concluded that Steppe can only concentrate and persist for two-hour periods and cannot work in a job with fast-paced demands.  This RFC explicitly accounts for Steppe's limitations in concentration, persistence or pace.  It is also supported by the medical evidence that Steppe could perform simple, routine tasks despite his limitations in concentration, persistence, or pace.  Because the ALJ explicitly accounted for Steppe's limitations in his RFC, the ALJ properly included all of Steppe's limitations in his hypothetical to the VE.

### V.  Recommendation

Upon consideration of the foregoing, I respectfully recommend that:

1.  The Commissioner's final decision in this case be **AFFIRMED**; and

2.  The Clerk be directed to enter judgment accordingly and **CLOSE** the file.

**Respectfully recommended** in Orlando, Florida on the 5th day of February, 2013.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Presiding United States District Judge
Counsel of Record